No. 12-70032

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

GARCIA GLENN WHITE

Petitioner-Appellant,

v.

RICK THALER
Director, Texas Department of Criminal Justice,
Correctional Institutions Division,
Respondent-Appellee.

_____

On Appeal From the United States District Court
For the Southern District of Texas
Houston Division

_____

**OPPOSITION TO APPLICATION
FOR CERTIFICATE OF APPEALABILITY**

_____

Petitioner-Appellant Garcia Glenn White was properly convicted and sentenced to die in Texas state court for the murders of twin sisters Bernette and Annette Edwards. He now requests a certificate of appealability (COA) to appeal the lower federal court's denial of the following claims:

1.    the prosecution improperly struck an African-American veniremember, in violation of *Batson v. Kentucky*[1];

2.    the trial court improperly excused jurors for cause based on their views regarding the death penalty;

3.    his confession should have been suppressed because he invoked his right to counsel;

4.    he has new evidence demonstrating his actual-innocence of the crime for which he was convicted;

5.    he does not merit the death penalty because he no longer represents a future danger, specifically to prison society;

6.    he has new factual evidence that would have altered the jury's answers to the special issues;

7.    he should be granted a new trial on punishment because the future-dangerousness and mitigation special issues violate *Apprendi v. New Jersey*[2];

8.    the mitigation special issue is insufficient under the "mixed signals" analysis of *Penry v. Johnson*[3];

9.    the mitigation special issue resulted in an ex post facto violation;

10.    the Texas death penalty statute violates the Eighth and Fourteenth Amendments;

---

[1]    476 U.S. 79 (1986).

[2]    530 U.S. 466 (2000).

[3]    532 U.S. 782 (2001) (*Penry II*).

11.    he was denied equal protection of the law; and

12.    Texas's clemency procedures violate equal protection because of his race, and the procedures violate international law.

This Court should deny a COA because reasonable jurists would not find the lower court's rejection of these claims debatable.

## STATEMENT OF THE CASE

White was convicted and sentenced to death for the murders of twin sisters Bernette and Annette Edwards. CR 5, 242-43.[4] White directly appealed his conviction and sentence to the Texas Court of Criminal Appeals, which affirmed the conviction and sentence in an unpublished opinion delivered on June 17, 1998. *White v. State*, No. 72,580 (Tex. Crim. App.).

White filed a state application for writ of habeas corpus in the trial court on October 16, 1998. 1 SHCR 111. The trial court then entered findings of fact and conclusions of law recommending that White be denied

---

[4]   "CR" refers to the clerk's record of pleadings and documents filed with the court during trial, followed by page number(s). "Supp. CR" refers to the supplemental clerk's record, followed by page number(s). "RR" refers to the state record of transcribed trial proceedings, preceded by volume number and followed by page number(s). "SHCR" refers to the state habeas record, preceded by volume number and followed by page number(s). "SX" refers to State's Exhibit, followed by exhibit number.

relief.  *Id.* at 259-290.  The Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief on February 21, 2001. *Ex parte White,* No. 48,152-01 at cover and Order.

White then sought relief in the lower court but subsequently moved to dismiss the action so that he could return to state court and exhaust certain claims.  *White v. Cockrell*, No. H-01-95, Docket Entry (DE) 21. The lower court granted the motion and dismissed the action without prejudice on January 9, 2002.  DE 22-23.  White then filed a second state habeas application in the trial court on January 11, 2002.  2 SHCR 2. However, the Court of Criminal Appeals dismissed the application for abuse of the writ on April 24, 2002.  *Ex parte White,* No. 48,152-02 at cover and Order.

White filed a federal habeas petition on May 3, 2002.  *White v. Thaler*, No. 4:02-cv-01805 (S.D. Tex.), DE 27.  The Director filed an answer and motion for summary judgment on October 9, 2002.  DE 39. On July 18, 2003, the district court granted White an administrative stay pending the outcome of DNA retesting, due to questionable procedures by the Houston Police Department Crime Lab.  DE 53.  White subsequently filed two additional state habeas applications.  *Ex parte White*, Nos.

48,152-03 & -04.  The state court dismissed these applications pursuant to 11.071, Section 5(a) of the Code of Criminal Procedure on May 6, 2009. *Id.* at covers and Order.

On June 30, 2009, following the retesting, the lower court lifted the state and issued a new scheduling order.  DE 63.  White filed an amended petition on December 31, 2009, DE 64, and the Director filed a subsequent answer on September 9, 2010.  DE 70.  On September 30, 2011, the district court granted the Director's motion for summary judgment, denied White's amended petition, and denied White a COA.  DE 81 & 82.  White then filed a motion to alter or amend the judgment, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.  DE 83.  The court denied the motion on August 1, 2012.  DE 87.  White's COA application in this Court followed.

## STATEMENT OF FACTS

In late November of 1989, King Solomon attempted to contact his girlfriend Bonita Edwards.  15 RR 39.  Solomon last spoke to Bonita on Wednesday, November 29, 1989, and found it unusual that Bonita did not answer her phone the next day.  *Id.* at 39.  After trying to contact Bonita

on Thursday, Friday, and Saturday, he went over to Bonita's apartment, where she lived with her twin daughters Annette and Bernette. *Id.* at 36, 40. When he got no answer, he asked neighbors if they had seen Bonita, but no one had. *Id.* at 40. Solomon left but later came back and talked to a maintenance man who asked the apartment manager to help him open the door to the Edwards' apartment. *Id.* at 41, 45. The maintenance man went in, came out, and asked the manager to come inside. *Id.* at 45. When the manager opened the door, Solomon looked inside and saw two bodies lying on the floor. *Id.* at 46. The police and paramedics were then called. *Id.* at 26-27.

Homicide Officer Leonard Dawson arrived at the crime scene at 2:45 p.m. *Id.* at 58. He saw three dead females inside the apartment, one just inside the front door, one in the dining area, and one in a bedroom. *Id.* at 60. Annette Edwards was lying face down semi-nude with her head on a pillow and a blanket partially covering her. *Id.* at 75-76. Her twin sister Bernette had a towel wrapped around her neck and shoved into her mouth. *Id.* at 85. Bonita was clothed but had blood all over her shirt. *Id.* at 78, 83. The three women had sustained multiple stab wounds to the neck and chest and had been dead for several days. *Id.* at 79, 83-84, 146-

47, 275-307.  Although there was no sign of a forced entry into the apartment, the telephone was off the receiver and the bedroom door had been forced open.  *Id.* at 70, 73, 91, 151.  Further, it appeared that Annette, who was found in the bedroom, had been sexually assaulted.  *Id.* at 153.  Moreover, blood was found all over the walls and on numerous items in the apartment, including the bathtub and kitchen sink.  *Id.* at 76-78, 83, 88-100, 109-10, 151.

The initial interviews of witnesses proved to be fruitless and the crime remained unsolved for nearly six years.  *Id.* at 153-56.  However, in July of 1995, the police finally received a break in the case.  During an interview regarding an unrelated murder of a convenience store owner involving White, Tecumseh Manuel, a close friend of White's, told the police that White had admitted to killing the Edwards family.  16 RR 185-86, 189-90.  Officer Todd Miller took a statement from Manuel on July 20, 1995, and arrested White the following day.  *Id.* at 190.  Miller contacted Sergeant Rudolph because he had been involved in the original investigation of this case, and Rudolph questioned White for several hours during the early morning of July 22, 1995.  15 RR 157-59; 16 RR 193-94.  White denied his involvement in the murders during the interview and

believed the police were lying to him about Manuel implicating him in the crime. 15 RR 161. Then, Miller showed White a portion of the taped statement from Manuel. 15 RR 161; 16 RR 195. Afterwards, Miller asked White if he was ready to tell the truth, and White stated that he was. 16 RR 196.

White then gave a videotaped statement of his version of the murders. 15 RR 162; 16 RR 196. The gist of White's statement was that he and Terrence Moore went over to Bonita's apartment to do drugs and have sex with her. SX 55A. They both tried to have sex with Bonita and, after they failed, Bonita got mad because they would not share the drugs with her. *Id.* A fight ensued, and Moore ended up stabbing all of the women. *Id.* White claimed that he fondled one of the girls and then ejaculated. *Id.*

White acknowledged during the interview that Terrence Moore was no longer alive. *Id.* The police then began to investigate Moore's death and ultimately discovered that Moore had been killed on July 25, 1989, four months before the Edwards had been murdered. 16 RR 205-06, 224. Miller and Rudolph confronted White with this discrepancy, and then White gave another taped statement. *Id.* at 206-09. In this brief

statement, White admitted that he made up the story involving Moore, and he confessed to killing all three women himself. SX 56A. Further, serology and DNA testing revealed that semen found on a beige sheet from one of the bedrooms was consistent with White's DNA and that blood found on the same sheet was consistent with the DNA of either Annette or Bernette. 16 RR 240-41; 17 RR 381-384. The DNA retesting conducted several years ago further inculpated White. DE 70, Exhibit A; DE 64, Exhibit 14 at 5-6.

## II.    Facts Pertaining to Punishment

### A.    State's evidence

During the punishment phase, the State proved that White had committed two prior murders, including one capital murder. With regard to the capital murder, Hau Pham, a sixteen year old immigrant from Vietnam, testified that on July 13, 1995, two men came into his father's convenience store and robbed it. 19 RR 33-34. Around 3:00 p.m. that day, Hau heard a scream and then one of the men grabbed him by the neck and told him to open the register. *Id.* at 34-35. Hau recognized the men because they had been in the store earlier in the day. *Id.* at 34. One man was "fat" and one had a medium build. *Id.* at 36. Hau attempted to open

the register but could not, so one of the men turned it upside down and eventually opened it. *Id.* at 36-37. Although money was in the register, Hau did not know if the men took it. *Id.* at 37. Hau also saw his father, Hai Pham, lying on the floor with blood all over him. *Id.* at 37. The men took Hau to the storeroom and put a milk carton over his head. *Id.* at 37-38. They then took some cigarettes and walked out of the store. *Id.* at 38.

When the police arrived, Hai Pham was found on the floor still alive, but incoherent and with a large gash over his eye. *Id.* at 12. The police attempted to communicate with him through an interpreter but were unsuccessful. *Id.* at 13-14. Hai died several days later of multiple blunt trauma to the head with skull fractures, brain contusions, and associated complications. *Id.* at 47, 83-84. Hau was shown photographs of possible suspects and identified White as the "fat" man. *Id.* at 46-47, 62-63. Officer Miller then got a warrant for White's arrest, and White gave a videotaped statement admitting his involvement in the crime. *Id.* at 64-73. In the statement, White admitted that he grabbed Hai Pham, threw him to the floor, hit him several times, and kicked him in the chest when he tried to get up. SX 98. White was charged with capital murder for this offense. 19 RR 65.

With regard to the second offense, several Houston police officers testified that, on November 1, 1989, they were dispatched to an abandoned house on the 3400 block of Linn Street. 20 RR 114, 121. When the officers arrived, White and Raymond Manuel were at the scene. *Id.* at 115, 121. Officer Philip Clark pulled away plywood from one of the windows and saw a body laying in a back room. *Id.* at 116. When homicide officer Wayne Wendel arrived, he found the body of a black female, Greta Williams, beaten to death and covered in carpet. *Id.* at 22-23, 134. Greta's step-mother testified that Greta had been missing for several days. *Id.* at 110-11. Greta's body was in the early stages of decomposition and there was evidence of head trauma. *Id.* at 129. Broken teeth were by her neck, and the blood spatters on the walls indicated that she had sustained repeated blows. *Id.* at 131-32. An autopsy revealed that Greta had been struck by a blunt object at least ten times and died from trauma to the head, face, chest, and abdomen. *Id.* at 190-95.

When White was initially questioned about the incident, he gave a statement in which he admitted seeing Greta walking down the street but denied having anything to do with her murder. *Id.* at 178-79. White was charged with the murder, and the case was presented to the grand jury on

11

November 29, 1989.  *Id.* at 141-42.  At that time, however, White was "no billed" because there was insufficient evidence for the grand jury to present the indictment.  *Id.* at 142.  But when the police questioned Tecumseh Manuel about his knowledge of the Hai Pham murder, Manuel told the police that White told him about his involvement in both the instant case and Greta Williams's murder.  19 RR 67.

The police confronted White with this new information, and White agreed to give another statement regarding his involvement in Greta's death.  20 RR 207-08.  White stated that he approached Greta and offered to pay her for sex.  SX 116A.  They went to the abandoned house on Linn Street and had sex.  *Id.*  Afterward, White believed that Greta had taken some of his money and, when he started to walk away, Greta pulled his shirt and started hitting him.  *Id.*  White hit her hard about three times, and Greta fell to the ground moaning and motionless.  *Id.*  White then rolled Greta up in carpet and left.  *Id.*  White further stated that he and Manuel came back to the house two weeks later and noticed a foul odor coming from the house.  *Id.*  Although White knew it was Greta's body that was causing the smell, he told Manuel that it was probably a dead dog, and they ended up calling the dog pound.  *Id.*  According to White, the

health department contacted the police when they found Greta's body inside. *Id.*

## B. Defense's evidence

White's mother, Lizzie White, testified that White was a poor student in school but had good conduct records, was only disciplined once, and got along well with his siblings. 21 RR 230-37. White was a starter on the Wheatley High football team, wanted to play college and pro football, and got accepted to Lubbock Christian College to play football. *Id.* at 237-39. However, White injured his knee during his first semester, which terminated his football career, and he dropped out of school. *Id.* at 239-40. White came back home and, after working several jobs, he got a job with Clean America sandblasting buildings. *Id.* at 240-44. Eventually, he was promoted to crew leader. *Id.* at 244. However, in March of 1988, he sustained a serious fall on the job and was hospitalized. *Id.* at 245-46. The injury resulted in pain and drug use, and White started hanging around drug abusers. *Id.* at 246-49. Although White's medical records were not available, records were produced showing that White had been admitted and discharged from the hospital around that time. *Id.* at 283. Further, although White had three children whom he loved and was

separated from his common-law wife, he was a poor provider and was behind on his child support statements. *Id.* at 249-53. Lizzie asked the jury to spare her son's life. *Id.* at 254.

Monica Garrett, White's sister, testified to similar effect as her mother. She stated that White was a nice brother who got along well with his siblings. *Id.* at 271. Although he had difficulty in school, she tried to help him with his grades, but to little avail. *Id.* at 271-72. Monica and her siblings considered White to be a football hero. *Id.* at 272-73. She also asked the jury to spare White's life. However, both Monica and Lizzie acknowledged on cross-examination that White did not ask them for help in times of trouble, specifically after the Greta Williams murder. *Id.* at 262-666, 276-78.

Robert Yohman, a clinical neuropsychologist, testified that he conducted a battery of tests on White and reviewed records provided by White's attorneys. *Id.* at 308-13. Yohman's examination resulted in the following findings: (1) White has an IQ of 76, which is below average, but not in the range of mental retardation, *id.* at 316; (2) White's scores in concentration, speed of thinking, attention span, achievement, memory, and executive functioning were low, *id.* at 319-24; (3) his language

functioning was within normal limits, *id.* at 321; (4) his MMPI[5] scores indicated that White was not emotionally distressed, depressed, or anxious, and there was no evidence of psychopathology, *id.* at 325-26; (5) the MMPI also indicated that White was somewhat hostile, inhibited his aggression, was uncomfortable with others, and handled unacceptable feelings and impulses through denial and depression, *id.* at 327, 330; (6) White's difficulties might stem in part from a head injury, but there was no specific or definitive evidence to support this conclusion, *id.* at 331-32; (7) White increasingly became dependent on drugs, particularly crack cocaine, as he experienced problems, *id.* at 342; (8) White's violent actions apparently occurred while he was intoxicated, and he has no history of aggressiveness while sober, *id.* at 343; and (9) White would not present a danger to society while in prison because drug use is limited in that environment. *Id.* at 345-47.

Dennis Nelson, a psychologist, also testified that he examined White and conducted various tests on White's intellectual and emotional functioning, as well as his personality. *Id.* at 387, 390. According to these

---

[5]     Minnesota Multiphasic Personality Inventory.

tests, (1) White has an IQ of approximately 87 and has the mental age of a person twelve to thirteen years old, *id.* at 391-93; (2) the minor deficiency in his intellectual functioning may be influenced by organic or neurological problems, but the problem is only slight, *id.* at 397-401; (3) he is not emotionally disturbed, *id.* at 402; (4) he exhibits behaviors—rationalization of the offense, portraying himself as a victim of circumstance, insecurity, and emotional instability—that are consistent with those of other inmates, *id.* at 408-09; (5) although White is quiet and inhibited socially, he is not violent nor a troublemaker, *id.* at 410-11; (6) White's behavior was triggered by his drug use, *id.* at 412; and (7) if White's drug use can be controlled, as in a prison environment, he would not be dangerous. *Id.* at 425.

On rebuttal, the State presented a probation officer, John Thomas, who stated that on March 20, 1995, White received three years probation for theft. *Id.* at 451-52. As part of his alcohol and drug evaluation, he was referred to a program and did not follow through. *Id.* at 454-55. Further, although White admitted to using drugs on his personal data sheet, he denied being a drug abuser. *Id.* at 453-54.

## ARGUMENT

White seeks review of the final judgment of the court below denying his petition for writ of habeas corpus. However, there is no automatic entitlement to appeal. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). Rather, "[b]efore an appeal may be entertained, [White] must first seek and obtain a COA" as a jurisdictional prerequisite. *Id.*; *see also* 28 U.S.C. § 2253(c)(1)(A). A COA will only issue if White makes a substantial showing of the denial of a constitutional right, which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that)" the court below should have resolved the claims in a different manner or that this Court should encourage White to further litigate his claims in federal court. *Id.*; *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir. 2000).

Further, "the determination of whether a COA should issue must be be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000); *see also Kutzner v. Johnson*, 242 F.3d 605, 608 (5th Cir. 2001). Under "2254(d), a federal court may not

issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

In *Richter*, the Supreme Court re-emphasized § 2254(d)'s demanding standard, holding,

> [u]nder § 2254(d), a habeas court must determine what arguments or theories supported, or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. . . It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

131 S. Ct. at 786 (emphasis added). This is "'the only question that matters under § 2254(d)(1).'" *Id.* (quoting *Lockyer v. Andrade*, 583 U.S. 63, 71 (2003)). "If this standard is difficult to meet, that is because it was meant to be." *Id.* "Section 2254(d) reflects the view that habeas corpus

is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring in judgment)).  In short,

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 786-87.

As discussed below, even a threshold assessment of White's claims reveals that the district court's ruling is not debatable among reasonable jurists.  Consequently, this Court should deny White a COA.

## I.  This Court Must Reject White's *Batson* Claim.

White alleges that the prosecution improperly struck a venireman based on his race, in violation of *Batson v. Kentucky*.  Brief at 9-10.  First, White has waived this claim.  He attempts to incorporate by reference the district court's opinion without even mentioning the juror in question or the alleged discriminatory actions by the prosecution.  This Court has repeatedly held that a party cannot circumvent briefing requirements by

incorporating by reference pleadings filed in the lower court, and that any improperly briefed issues will not be addressed on appeal. *Beazley v. Johnson*, 242 F.3d 248, 266 (5th Cir. 2001); *United States v. Hall*, 152 F.3d 381, 398 n. 9 (5th Cir. 1998); *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993). By simply referring to his federal petition without briefing the claims, White has failed to preserve this issue for appeal. *Perillo v. Johnson*, 79 F.3d 441, 443 n. 1 (5th Cir. 1996). Moreover, issues raised in an application for COA must be properly briefed or they are deemed waived. *Dowthitt*, 230 F.3d at 742 n. 6; *Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999).

Second, White's claim has no merit. A criminal defendant suffers a violation of his equal protection rights when the State, with the intent to purposefully discriminate, exercises its peremptory challenges to remove venirepersons based on their race. *Batson*, 476 U.S. at 87. The *Batson* Court ruled that once a minority criminal defendant establishes a prima facie case of racial discrimination based on the State's use of peremptory challenges to strike members of the defendant's race from the venire, the burden shifts to the State to give race-neutral reasons for the peremptory

challenge. Once the prosecutor offers the race-neutral reason, the trial court must then decide whether the defendant has proven purposeful racial discrimination. *Id.* at 96-98; *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995). The prosecutor meets the requirement of a race-neutral explanation where his reason for the challenge is something other than race. *Hernandez v. New York*, 500 U.S. 352, 360 (1991). A legitimate reason is "not a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, 514 U.S. at 769. Unless discriminatory intent is inherent in the explanation, the trial court should deem the reason offered race-neutral. *Id.*

If the reason is race neutral, the trial court must then decide whether the opponent of the strike has proven purposeful racial discrimination. *Id.* at 767. The ultimate burden of persuading the court that the State's peremptory challenges stem from a racially discriminatory purpose lies with and never shifts from the defendant. *Batson*, 476 U.S. at 94 n. 18. The focus of the inquiry is upon the intent of the prosecutor whose credibility, therefore, becomes the deciding factor. *Id.* at 98; *see also Hernandez*, 500 U.S. at 367 (holding that "[t]he credibility of the prosecutor's explanation goes to the heart of the equal protection analysis,

and once that has been settled there seems nothing left to review").

Further, a state court's factual findings regarding a *Batson* challenge are presumed to be correct, and White has the burden to overcome this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El*, 545 U.S. at 240. And, ultimately, a federal court can only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006).

The prospective juror in question was Joseph Babineaux. When he was struck, the defense objected on *Batson* grounds and a hearing was held. The trial court overruled the objection. As the Court of Criminal Appeals found, the prosecutor stated that he struck Babineaux because (1) Babineaux refrained from giving his personal opinions about the various issues in the case; (2) Babineaux indicated that the prosecutor was trying to trick him into providing an answer as to his feelings about the death penalty; and (3) the prosecutor had a general feeling that Babineaux did not trust him or was suspicious of him. *White v. State*, slip op. at 9-10. For instance, the prosecutor asked Babineaux about an answer on his juror questionnaire in which he disagreed with the statement that capital

punishment was just and necessary. When asked about his thoughts on the issue, Babineaux indicated that capital punishment might be necessary and then stated, "It almost feels like a trick question." With regard to this statement, the prosecutor said:

> At that point in time, I perceived from Mr. Babineaux, that he was basically saying that he thought I was trying to trick him. And my feeling for the rest of the [*voir dire*] after that was that in response to the questions he was carefully, carefully listening to everything I said to determine whether or not I was using something or doing something that was trying to get him or he didn't want to be . . . The feeling I have, and that's the reason we're using the peremptory, is because the feeling I have is that he is very suspicious of me and my motives and suspicious of what I'm about and thinks I'm somehow trying to deceive him or get him to say something that's going to disqualify him.

10 RR 1247. The prosecutor's decision to strike Babineaux based on his feeling that Babineaux was suspicious of the prosecutor's motives was sufficient to qualify as a race neutral reason. *United States v. Turner*, 674 F.3d 420, 436 (5th Cir.) (intuitive assumptions, hunches, and factors that cannot be articulated "can all be proper bases for rejecting a potential juror, even in the *Batson* context"), *cert. denied*, 133 S. Ct. 302 (2012). The prosecutor was also wary of the fact that Babineaux, when asked to rate his feelings of the death penalty on a scale from 1 to 10 (1 being

strongly opposed to the death penalty, 10 strongly in favor), would not give the prosecutor a number, even though every other juror had. However, the prosecutor was careful to point out that the strike was not based on race, particularly because two African-American men had already been accepted for the jury. *See United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993) (fact that prosecutor was Hispanic and had seated another Hispanic female on the jury showed that his challenge was specific to juror and not to juror's race). Indeed, the prosecutor stated that, aside from his perception of Babineaux, he actually wanted Babineaux as a juror.

On direct appeal, the state court concluded as follows:

Despite [White's] assertions to the contrary, we conclude the State's reasons are generally supported by the record. Furthermore, [White] has shown us nothing in the record indicating the prosecutor's reasons mentioned above were pretexts for intentional discrimination; although he does contend some of the accepted jurors responded similarly to Babineaux and the State did not always ask questions in the same manner. However, where the State offers neutral reasons for its peremptory strike, we cannot say that the fact that there were acceptable jurors possessing one or more of the objectionable traits is sufficient to establish disparate treatment. Therefore, in deferring to the trial court's observations, we conclude that the trial court's holding that the State's reasons for excusing Babineaux were race-neutral was not clearly erroneous.

24

*White v. State*, slip op. at 9-10. The lower court found this decision to be reasonable because White reiterated the same arguments in his federal petition. For example, White referred to one accepted juror who stated that, in her opinion, attorneys were manipulative. *See* 10 RR 1026. Yet, this particular juror's statement "was a general one about all lawyers, whereas the prosecutor articulated reasons why he thought Babineaux was suspicious of him in particular." DE 81 at 19. Thus,

> Considering the trial court's superior ability to make credibility determinations, the absence of any evidence of a pattern of striking minority venire members, and the fact that two African-Americans sat on the jury that convicted White and sentenced him to death, the TCCA's conclusion that White failed to prove purposeful discrimination is not an unreasonable determination of the facts, or an unreasonable application of *Batson.*

*Id.* This decision is not subject to debate, particularly considering that White has failed to brief this issue and, consequently, has not met his burden of proving purposeful discrimination. A COA, therefore, is not warranted.

## II. White Is Not Entitled to a COA with Respect to His Claim That the Trial Court Improperly Excluded Jurors Opposed to the Death Penalty.

White contends that the trial court improperly excluded prospective jurors generally opposed to the death penalty.  Brief at 11-12.  Although White refers to "jurors," he only mentions veniremember Hamann.  *Id.* With regard to any others, once again he attempts to incorporate by reference his prior pleadings and the lower court's opinion.  As stated, White is subverting his briefing requirements, and he has waived his claim as it pertains to jurors other than Hamann.

At any rate, his claim has no merit.  The State may not exclude for cause a prospective juror solely on the basis of his views on the death penalty unless those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  In making the determination of juror bias, the State is not required to demonstrate that the prospective juror would "automatically" vote against imposition of the death penalty nor prove bias with "unmistakable clarity."  *Id.*

A trial court's finding of bias is a factual finding that must be presumed correct in federal habeas proceedings unless demonstrated to be clearly erroneous, and whatever ambiguity exists in the record must be resolved in favor of the trial court's finding. *Witt,* 469 U.S. at 429-31, 435; *Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997); *Russell v. Collins*, 998 F.2d 1287, 1293-94 (5th Cir. 1993); *Drew v. Collins*, 964 F.2d 411, 417 (5th Cir. 1992). Moreover, a trial court's grant of a challenge for cause for bias constitutes an implicit factual finding of bias and is sufficient to trigger the statutory presumption of correctness. *Witt*, 469 U.S. at 430; *Fuller*, 114 F.3d at 500. Therefore, it is White's burden to rebut the presumption of correctness. 28 U.S.C. § 2254(e)(1); *see also Fuller*, 114 F.3d at 501.

Here, the State posed a hypothetical to Hamann and asked her if it proved all the elements of the offense beyond a reasonable doubt based on testimony from a single eyewitness, would she require more evidence. Hamann stated that she would require the State to show more. 12 RR 1384-85. She reiterated her beliefs when questioned by the defense. *Id.* at 1389-90. Further, when the trial court explained the nature of the law and asked her if she would require a higher standard of proof, Hamann

27

stated, "I would. And I guess I didn't realize it until you put it this way I would." *Id.* at 1391. Therefore, the trial court's decision to exclude this juror was appropriate. *Buchanan v. Kentucky*, 483 U.S. 402, 416 (1987) (the State has an interest in obtaining a jury that does not contain members who are unable to follow the law with respect to an issue in a capital case); *United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995) (prospective juror properly excused when he indicated that he would hold the government to an impossible standard); *Drew*, 964 F.2d at 417 (when juror did not merely state that he might apply the reasonable doubt standard but stated that he would apply a standard higher than reasonable doubt, the court could correctly determine that the insistence on a higher burden would substantially impair his performance as a juror).[6]

---

[6]     In the lower court, White's claim also pertained to prospective jurors Raines and Guthrie. Should this Court decide to address those venire members, the Director notes that, like Hamann, both specifically stated they would hold the State to a higher burden of proof than the reasonable doubt standard because this was a death penalty case, even after the court pinned them down on the issue. 6 RR 493; 8 RR 730. For instance, when Raines was questioned by defense counsel, she indicated that she could apply the reasonable doubt standard. 6 RR 490-91. But when the court questioned her, explained the standard, and then asked if she would hold the State to a higher burden of proof, she said that she would. *Id.* at 491-93. Guthrie repeatedly stated that he would have to be 100% certain of guilt in this case and would hold the State to a higher

White's only argument is that the hypothetical by the State was misleading because no one saw White commit the crime. Brief at 11. His argument is irrelevant because the State was simply trying to determine if Hamann could follow the law as instructed; the specific facts of the crime were not an issue at that juncture. "Clearly established law ... does not mandate precise voir dire questions." *Ortiz v. Quarterman*, 504 F.3d 492, 503 (5th Cir. 2007). Regardless, as the lower court determined, this juror made it abundantly clear she would require more from the State than the law required. DE 81 at 22. This decision is not subject to debate among jurists of reason.

## III. White Did Not Invoke His Right to Counsel; Thus His Confession Was Not Improperly Obtained.

Next, White challenges his confession. The gist of White's allegation is that his confession violated *Miranda v. Arizona*[7] because he invoked his right to counsel prior to confessing to the crime when he was interviewed

---

burden of proof with regard to punishment. 8 RR 715, 717, 720. He also wavered when questioned by the defense, *id.* at 724-25; however, when questioned by the court about his reference to being 100% certain, Guthrie stated that he would require the State to prove more than beyond a reasonable doubt because this was a death penalty case. *Id.* at 726-30. Thus, the trial court's decision to exclude those venire members was proper.

[7]     384 U.S. 436 (1966).

by Officer Todd Miller.  The part of White's confession in question is as follows:

MILLER:  Alright [Glenn], I got something here I want to read you, and I want you to listen real carefully.

You have the right to remain silent and not make any statement at all and that any statement you make may be used against you and probably will be used against you at trial.

Any statement you make may be used as evidence against you in court.

You have the right to have a lawyer present to advise you prior to and during any questioning.

If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning.

And, you have the right to terminate this interview at any time.

Now [Glenn] do you understand those rights that I have just read to you?

WHITE:  Sir, that's the statement I was telling you about right there.  I have the right to a, one  . . . I definitely have the right to have a lawyer present.

MILLER:  That's right, and that's the same statement that I read to you each of the times that we've talked.  O.k.  There's five of them, and they write them down on this card for me.  O.k.  What I'm asking you is do you understand these rights?

WHITE:      Yes sir.

MILLER:     O.k.  Do you agree to waive those rights and tell
            me about the 1989 killing on Weaver Road?

            (Pause)

            [Glenn], do you agree to give up those rights and,
            and, and, tell me about what happened on Weaver
            Road in 1989?

WHITE:      Yes sir.

SX 56-A (transcript).  White contends that his statement that he had the

right to counsel was a request for an attorney at that time.  Brief at 12-15.

He further claims that because he requested counsel with respect to

another murder, that request should have essentially transferred to the

instant case, or at least indicates that the above colloquy amounted to an

invocation of the right to counsel.  Moreover, White contends that his

confession was involuntary because he was incompetent to provide it, due

to his drug use and low IQ.  White's claims have no merit and, in the

alternative, any error was harmless.

## A.    Evidence presented during the pre-trial hearing.

Officer Todd Miller testified during the pre-trial hearing that he was

initially assigned to the case in order to investigate the Hai Pham murder.

14 RR 19. After Hau Pham identified White, Miller got an arrest warrant for White and arrested him on July 21, 1995. *Id.* at 22-23, 25-26. Miller read White his *Miranda* warnings on several occasions, and White waived them each time. *Id.* at 26-27, 29. Miller eventually confronted White with Tecumseh Manuel's statement implicating him in the Hai Pham case. Consequently, White agreed to give a formal statement regarding that case. *Id.* at 25, 30-35; SX 98.

Four to five minutes after the conclusion of this formal statement, White was questioned about the Greta Williams murder, even though he had not been arrested or charged in connection with that offense. 14 RR 35-36. White initially denied any involvement in the murder, but was again confronted with Manuel's statement implicating White in the Williams case, as well as other contradictions in White's statements. *Id.* at 36-38. White then admitted his involvement in the Williams murder and agreed to make a second formal statement. *Id.* at 38-39. White then confessed to murdering Greta Williams. *Id.* at 39-40; SX 116-A.

Following a restroom break, Officers Brown and Rudolph began to interview White regarding the instant case, at approximately 2:00 a.m. 14 RR 42-43. The interview lasted until 4:55 a.m. when Rudolph

terminated the interview because he could tell that White was getting tired. 15 RR 159. Later in the afternoon on July 22, 1995, Rudolph interviewed White for about an hour starting at 1:50 p.m. 14 RR 43-44. During the interview, White did not believe what Rudolph was telling him about Manuel also implicating him in the Edwards murders, and then Rudolph showed White a tape of the Manuel interview. *Id.* at 44-45. Afterwards, Rudolph asked White if he would tell the truth about this case, and White agreed to make a third statement. *Id.* at 45. Miller, who conducted the taped interview, read White his statutory warnings, asked him if he understood his rights, and asked White if he would waive them. *Id.* at 45-46; SX 55-A. White stated that he understood them and that he would waive them. 14 RR 45-46; SX 55-A. During the statement, White said that he sexually assaulted one of the girls, but that Terrence Moore killed them. SX 55-A. White also acknowledged that Moore had been killed at some point, and Miller ultimately terminated the interview to find out the circumstances of Moore's death. 14 RR 46-50; SX 55-A.

Subsequently, the police discovered that Terrence Moore had been killed four months prior to the Edwards murders. 14 RR 53-54. Thus, Miller interviewed White a final time on July 28, 1995, beginning at 10:40

a.m, and White admitted that he alone killed the Edwards. *Id.* at 55; SX 56-A.[8]  The beginning of this interview, which contains the disputed statement forming the basis of White's claim, is set forth above.

With regard to White's statement that he had the right to an attorney, Miller explained that, prior to the interview, he told White that he did not want him to mention anything about the Hai Pham case because White already had an appointed attorney in that case.  14 RR 61. Thus, when White said that he had the right to an attorney as he had mentioned to Miller before, he was referring to the conversation he and Miller had prior to the interview.  *Id.* at 60.  And Miller explained to White that he had that right just as he did in the other cases.  14 RR 60; SX 56-A.  The transcript itself reflects Miller's attempts to inform White that he did have the right to an attorney for the purpose of the instant case and to clarify whether or not White would waive that right and make a statement.  SX 56-A.  As Miller stated, at no time during the interview, let alone anytime prior, did White request an attorney.  14 RR 62-65. Miller also testified that the statement was voluntary, and that White was

---

[8]  To this point, White had been formally charged only in the Hai Pham case.  14 RR 54.

not intoxicated, was never threatened, was not promised anything in return, and understood the questions. *Id.* at 62-63. Indeed, Miller stated that White told him that he had been "crack free" for two or three days. *Id.* at 67. Miller also immediately terminated the interview when White stated that he did not want to talk about the case anymore. *Id.* at 64-65; SX 56-A.

White also testified during the hearing and stated that he told the police from the beginning that he wanted an attorney. 14 RR 114. According to White, Miller said, "A lawyer can't help you now." *Id.* White also claimed that Miller told him he would not be charged in any of the cases if he talked. *Id.* at 117-19, 126. On rebuttal, Miller testified that White's assertions were untrue. *Id.* at 135-36, 141, 146-48

The trial court entered findings of fact and conclusions of law, finding that (1) White was informed of his rights and voluntarily waived them prior to all the interviews and recorded statements; (2) at the time of these interviews, White had only been charged with the Hai Pham murder and never invoked his right to an attorney with regard to the Greta Williams or Edwards cases; (3) White never invoked his right to an attorney during any of the interviews; (4) White understood his rights and

was not under the influence of drugs or alcohol at the time of the interviews; (5) White was not threatened, coerced, or promised leniency in return for his statements; and (6) the taped statements were made under voluntary conditions. Supp. CR 4-7. On both direct appeal and state habeas review, the state court rejected White's allegations. *White v. State*, slip op. at 1-8; 1 SHCR 264, 274-78. The lower court determined that the CCA's decision was not unreasonable, and for the following reasons, this conclusion is not debatable.

### B. White did not invoke his Fifth Amendment right to counsel.

The procedural safeguards established in *Miranda v. Arizona* protect an accused's Fifth Amendment privilege against self-incrimination during custodial interrogation. 384 U.S. at 478-79. Prior to custodial interrogation, the subject is to be informed that (1) he has the right to remain silent; (2) anything said can and will be used against him in court; (3) he has the right to consult with counsel prior to questioning; (4) he has a right to have counsel present at the interrogation; and (5) if he cannot afford an attorney, one will be appointed. *Id.* at 468-70, 479. Further, "[i]f the individual states that he wants an attorney, the interrogation must

cease until an attorney is present." *Id.* at 474.

In *Davis v. United States*,[9] the Supreme Court held that the invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." 512 U.S. at 459. The Court stated that the police need not cease questioning a suspect if the suspect makes an ambiguous or equivocal reference to an attorney that the officer would have understood "only that the suspect *might* be invoking the right to counsel." *Id.* (emphasis in original). Essentially, a suspect is required to unambiguously request counsel and "a statement either is such an assertion of the right to counsel or it is not." *Id.* (quoting *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984)). Thus, the Supreme Court set out a bright line rule that, in order to invoke the right to counsel during questioning, the suspect

> must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [*Edwards v. Arizona*][10] does not require that the

---

[9]     512 U.S. 452 (1994).

[10]     451 U.S. 477 (1981).

officers stop questioning the suspect.

*Id.* (footnote added). The *Davis* court then held that a suspect's statement during interrogation that "maybe I should talk to a lawyer" did not satisfy this standard. *Id.* at 462.

In this case, White was questioned by Detective Miller about two other unrelated murders before he was questioned about killing the Edwards girls. Miller read White his *Miranda* warnings each time, and White waived them. When Miller began the *second* statement pertaining to the instant case, White remarked that he had the right to an attorney. But White was merely referring to his previous conversation with Miller in which the right to counsel with regard to another case was discussed. Miller informed White that he had the right, just as he did in the other cases. Then he asked White if he understood his rights and would waive them. White agreed to do so. At no point did White specifically say that he wanted an attorney present for the purpose of this interview or that he wanted to talk to a lawyer first. White's statement was nothing more than an acknowledgment that he had the right to an attorney. This Court has held that ambiguous statements of this type do not amount to a clear invocation of the right to counsel. *United States v. Carrillo*, 660 F.3d 914,

923 (5th Cir. 2011) (under the circumstances, suspect's statement "I wish I had a lawyer here" was not an invocation of the right to counsel), *cert. denied*, 132 S. Ct. 1639 (2012); *United States v. Montes*, 602 F.3d 381, 385 (5th Cir. 2010) ("maybe I should get an attorney" amounted to an ambiguous request for counsel); *United States v. Cruz*, 22 F.3d 96, 98 (5th Cir. 1994) (when officer asked defendant if he had an attorney, defendant's response that he was a working man who could not afford an attorney could only be construed as a statement of fact, not a request for counsel); *United States v. Cherry*, 733 F.2d 1124, 1130 (5th Cir. 1984) ("Why should I not get an attorney?" did not amount to a clear request). Similarly, absent a specific request to have an attorney present during questioning, White's statement of fact that he had the right to counsel cannot be construed as an invocation of that right.

Further, when Miller subsequently informed White that he did have the right to an attorney, Miller asked White if he understood his rights and if he would agree to waive them. White responded, "Yes sir." Thus, Miller attempted to ascertain whether White was invoking his right, and White clarified that he was not. Given that White waived his rights after

Miller asked a clarifying question, it was proper for Miller to question White about the case. *Davis*, 512 U.S. at 461 (although it is not required "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."). Consequently, because White explicitly waived the right when further questioned, his Fifth Amendment right to counsel was not violated.

White also apparently argues that the police exploited his low IQ, drug dependency, and physical weariness and then badgered him into confessing. He further states that, given his condition, he was operating under the belief that he had requested counsel and the police deceived him, which invalidates any waiver. Brief at 12-14. White never presented any evidence to support these contentions. And aside from White's pre-trial testimony, which the trial court found to be not credible, the record does not support the claim. Indeed, the police brought White food and made sure he was comfortable, voluntarily terminated questioning on one occasion when it was determined that White was getting tired and, with regard to White's final confession, terminated the interview immediately

when White said he did not want to talk about the case anymore. White stated that he had been "crack free" for several days, and it did not appear to police officers that his statement was given under any mental duress. There is nothing to suggest that White was forced into confessing with respect to any of the cases. In short, White has offered nothing to show his confession was involuntary *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'") (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

Last, White suggests that because he had appointed counsel in the Hai Pham case, the police never should have questioned him regarding the Edwards murders. Brief at 13. In other words, he appears to also contend that the questioning violated his Sixth Amendment right to counsel. As the district court found, DE 81 at 24, the Sixth Amendment right to counsel does not attach until the first formal charging proceeding. *Moran v. Burbine*, 475 U.S. 412, 428 (1986). The record here clearly shows that, at the time White confessed to the Edwards murders, he had only been charged in the Hai Pham case, and he was not questioned about

this offense during his confession. Moreover, the Sixth Amendment right to counsel is "offense specific," and if a defendant has been appointed counsel in connection with one offense, it does not attach to a separate uncharged offense unless both offenses could be considered the same under *Blockburger v. United States*, 284 U.S. 299 (1932). *Texas v. Cobb*, 532 U.S. 162, 164, 172-73 (2001). Clearly, these murders have no relation because they involve two completely distinct criminal transactions occurring six years apart.

## C. Any error was harmless.

Assuming for argument's sake that the trial court erred in admitting White's confession, the error was harmless. The Supreme Court has held that the admission of an involuntary confession is trial error subject to a harmless error analysis. *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991). Following *Fulminante,* the Court also held that trial error is subject to a lower harmless error test on collateral review. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Pursuant to *Brecht v. Abrahamson*, federal habeas relief may not be granted for trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in

determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Here, White's final confession was not significant because it was a statement confirming the obvious. White's ambiguous comment about having a right to a lawyer occurred just prior to his confession in which he admitted to killing the Edwards girls by himself. But in his previous confession, he stated that he was involved in the crime with Terrence Moore. The police subsequently discovered that Moore had died before the murder of the Edwards girls. White gave his final confession when he was confronted with this fact. However, the moment Moore was erased from the picture, this left White as the sole perpetrator of the murders based on his previous statement implicating himself. Thus, White's first confession of his involvement in this offense combined with the information about Terrence Moore and the DNA evidence from the semen was more than enough to support a guilty verdict. And although the DNA evidence was temporarily suspect, retesting at an independent lab proved to be even more inculpatory because it ruled out anyone else as a contributor. Consequently, any error did not have a substantial or

injurious effect on the jury's verdict. For these reasons, COA is not merited.

## IV. White's Actual-innocence Claim Has No Merit.

White contends that he has new DNA evidence demonstrating his "actual innocence." White claims that because the DNA retesting identified an unknown DNA donor on one of the specimens, this indicates an unaccounted for person—one who could have committed the crime—was at the scene. The district court's rejection of this claim is not debatable. DE 81 at 8-10.

Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). White raised this claim in his third state habeas application, which the Court of Criminal Appeals dismissed under Article 11.071, Section 5(a) as an abuse of the writ. *Ex parte White*, No. 48,152-03 at cover and Order.

Further, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a

showing of cause for the default and actual prejudice that is attributable to the default, or that the federal court's failure to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). A miscarriage of justice in this context means that the petitioner is actually innocent of the crime for which he was convicted or of his sentence. *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992).

The Supreme Court has held that "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). This gateway requires a petitioner to present "new reliable evidence" that was not presented at trial, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id.* at 537 (quoting *Schlup*, 513 U.S. at 324). Further, review of a *Schlup* inquiry includes consideration of *all* the evidence in the case—both old and new and without regard to rules of admissibility that govern trials. This is essentially a predictive standard regarding whether reasonable jurors

would have a reasonable doubt in light of all the evidence. *Id.* at 538-39.

White's claim fails because he is attempting to use the actual-innocence exception to argue an actual-innocence claim, which is not cognizable on federal habeas review. *Herrera v. Collins*, 506 U.S. 390 (1993); *Lucas v. Johnson*, 132 F.3d 1069 (5th Cir. 1998). At any rate, White cannot satisfy *Schlup's* demanding standard. The results from the State's retesting with Identigene prove without question that White was in the Edwards's apartment. Several areas of a beige sheet were tested—areas E, G, P, and V—and White could not be excluded as a contributor to the DNA found in these areas. The testing produced probabilities such as 1 in $2.8 \times 10^{17}$, 1 in $1.4 \times 10^{16}$, and 1 in $6.6 \times 10^{13}$, which rule out anyone else as a contributor. DE 70, Exhibit A; DE 81 at 10. Moreover, the test results from Serological Research Institute, White's independent tester, are incriminating. DE 64, Exhibit 14 at 5-6.

The Serological Research Institute report states that there were trace amounts of DNA that came from a source other than White, Annette Edwards, or Bernette Edwards. DE 64 at 15 and Exhibit 14. White considers this finding to be significant. However, the evidence of

unidentified donors is not new. At trial, Joseph Chu, the serological expert, testified on cross-examination that there were indications of another DNA contributor with regard to samples taken from the beige sheet. 17 RR 388. Chu then conceded that he saw a report from his own lab that stated another suspect, G. L. Williams, was tested and that some of the stains on the beige sheet could have come from him. *Id.* at 393-94. Williams was apparently a close relative of the Edwards. *Id.* Further, Chu testified that testing of a semen stain on a blue sheet not admitted into evidence revealed DNA that did not match White's. *Id.* at 404-05. During final argument, defense counsel stated "that there were other people who very closely matched that DNA when they were doing other portions of the investigation over the years in this case." 18 RR 14. Thus, the jury was quite aware that the DNA testing indicated the presence of an unaccounted for individual or individuals. White's new evidence is irrelevant.

In sum, as the State proved at trial, the retesting demonstrates that White was at the crime scene. Thus, White fails to satisfy *Schlup*. It follows that he has also failed to meet the extraordinarily high threshold

of proof required to demonstrate that he has a legitimate, free-standing actual-innocence claim. *Herrera*, 506 U.S. at 400, 417.

## V. White's Claim That He No Longer Merits the Death Penalty Is Unfounded.

White contends that he no longer merits the death penalty because he no longer represents a future danger, specifically to prison society. Brief at 17. First, White has waived this claim because he simply incorporates by reference to the district court opinion without providing any argument to support his claim.[11]

Second, White's allegation is essentially that the jury's verdict was incorrect in hindsight and, consequently, he is actually innocent of the sentence he received. As stated, claims of actual innocence are not cognizable on federal habeas review. This claim is analogous to an allegation that a petitioner is actually innocent of the crime for which he was convicted based on new evidence.

---

[11] White's briefing on this issue pertains solely to the lower court's application of *Teague v. Lane,* 489 U.S. 288 (1989). But when the court rejected this claim, it did not mention *Teague.* DE 81 at 8-10.

Third, the future dangerousness special issue adopted by the Texas legislature asks the jury to determine "whether there is a *probability* that the defendant would commit criminal acts of violence that would constitute a future danger to society." Tex. Code. Crim. Proc. art. 37.071 § 2(b)(1) (emphasis added). It does not ask the jury to predict whether the defendant will, in fact, become a future danger. These are two separate questions. White's claim would require a post-verdict review of every Texas capital defendant's behavior while on death row prior to execution to ensure that the defendant actually constituted a future danger while in prison. The sheer impracticality of this position is obvious. He also presents no authority for his position.

Last, White's suggestion that he is no longer a future danger flies in the face of the trial evidence. In addition to murdering the Edwards family, the State showed White committed two other murders, including the capital murder of Hai Pham. Thus, a COA is not warranted.

**VI.** **A COA Should Not Issue with Regard to White's Claim That He Has New Factual Evidence That Would Have Altered the Jury's Answers to the Special Issues.**

Next, White contends that he has new factual evidence that would have resulted in a "no" to the deliberateness special issue, a "no" to the future-dangerousness special issue, and a "yes" to the mitigation special issue. The only new evidence White references is the DNA evidence of the presence of another individual. Brief at 21. Otherwise, his briefing is ambiguous on the issue.[12] Regardless, his claim fails for the following reasons.

White raised this claim in his second state habeas application that was dismissed for abuse of the writ. 2 SHCR 45-57; *Ex parte White*, No. 48,152-02 at cover. For the reasons explained above, this claim is procedurally barred.

Second, to the extent White is providing an actual-innocence argument, that claim is not cognizable on federal habeas review, as

---

[12]     White mixes together various arguments in this section, which appear to be unrelated. For example, he provides arguments pertaining to *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*) and the Ex Post Facto Clause, and he claims that he did not receive a proper mitigating instruction. Brief at 20-25. The Director will address these below in separate sections.

explained. Moreover, "the 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." *Sawyer*, 505 U.S. at 347. Thus, White cannot show 'actual innocence" based on new evidence supposedly leading to a different answer to the mitigation question.

Third, as demonstrated above, White's DNA evidence of another party is not new because that evidence was elicited at trial. Additional evidence of an unidentified party would not have altered the jury's answer to the special issues. And it certainly would not have impacted White's eligibility for the death penalty. Therefore, this Court must deny White's request for a COA.

## VII. White Is Not Entitled to a COA with Respect to His *Apprendi* Claims.

White claims that he should be granted a new trial on punishment because the future-dangerousness and mitigation special issues violate *Apprendi v. New Jersey.* The lower court's rejection of this claim is not debatable. DE 81 at 10-11.

First, White has waived this claim because it is inadequately briefed. He fails to explain why the special issues run afoul of *Apprendi*. Brief at 20-25.

Second, White raised this claim in his second state habeas application dismissed for abuse of the writ. 2 SHCR 11-23; *Ex parte White*, No. 48,152-02 at cover and Order. Therefore, it is procedurally barred.

Third, this claim has been consistently rejected. In White's district court petition, he alleged that the future-dangerousness question violates *Apprendi* because the jury is required to find beyond a reasonable doubt a "probability" that a defendant will commit future acts of violence. Thus, the word "probability" lowers the reasonable doubt standard. Additionally, White claimed that the mitigation issue violates *Apprendi* because it fails to assign a burden of proof on the State. DE 64 at 30-38.

But this Court has held that the use of the term "probability" in the future-dangerousness question does not violate the *Apprendi* decision. *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005). In *Rowell*, the Court also held that accepting the argument that the term "probability"

swallows the reasonable-doubt standard under an extension of *Apprendi* would result in a violation of *Teague v. Lane.  Id.*

Further, this Court has repeatedly held that the mitigation instruction is not unconstitutional for failing to assign a burden of proof on the State to prove an absence of mitigating evidence.  *Paredes v. Quarterman*, 574 F.3d 281, 292 (5th Cir. 2009); *Ortiz v. Quarterman*, 504 F.3d 492, 505 (5th Cir. 2007) ("The Texas death penalty scheme does not violate *Apprendi* or *Ring* [*v. Arizona*, 536 U.S. 584 (2002)]  by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances.") (citing *Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir. 2007)); *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006) ("We are not persuaded that Texas violated any principle of *Apprendi* or *Ring* in the trial of this case.  Specifically, it did not do so by not asking the jury to find an absence of mitigating circumstances beyond a reasonable doubt in addition to questions it required the jury to answer.  Put another way, a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death.").

## VIII.  This Court Must Reject White's *Penry II* Allegation.

White claims that the mitigation instruction is insufficient under the "mixed signals" analysis of *Penry II* and fails to allow the jury to give effect to mitigating evidence. Brief at 20-21.

First, the claim is procedurally barred because White raised it in his second state habeas application dismissed for abuse of the writ. 2 SHCR 23-31; *Ex parte White*, No. 48,152-02 at cover and Order.

Second, it is arguable White has not adequately briefed the claim because he fails to explain how the special issue sends mixed signals.

Third, the claim has no merit.  In his district court amended petition, White claimed that because the *Penry II* Court held that the supplemental mitigation instruction at issue in that case sent mixed signals to the jury, the same reasoning should be applied to the charge in his case because the current Texas mitigation instruction does not assign a burden of proof to the jury. DE 64 at 38-44. This Court has consistently rejected this allegation. *See Coleman v. Quarterman*, 456 F.3d 537, 541-42 (5th Cir. 2006) (claim that ambiguity in mitigation special issue regarding the burden of proof violated *Penry II* is meritless because no

precedent requires that the mitigation instruction assign a burden of proof); *Oliver v. Quarterman*, 254 Fed. Appx. 381, 386-87 (5th Cir. 2007) (rejecting claim that Texas's mitigation special issue runs afoul of *Penry II's* "mixed signals" analysis because it assigns no burden of proof and noting that the *Penry II* Court implicitly upheld Texas's sentencing scheme) (unpublished); *Manns v. Quarterman*, 236 Fed. Appx. 908, 912 (5th Cir. 2007) (rejecting claim because petitioner did not receive the "nullification" instruction at issue in *Penry II* and holding that "*Penry II* simply does not address which party bears the burden of proof on the mitigation special issue, nor does it require that the burden be assigned to a particular party") (unpublished).

Fourth, the claim is *Teague*-barred because the Supreme Court has never held that its *Penry II* ruling applies to Texas's current mitigation special issue. The "mixed signals" language pertained only to the supplemental nullification instruction at issue in *Penry II*. Indeed, *Penry II* implicitly approved of the current mitigation issue. 532 U.S. at 803.

Last, this Court has denied the claim that the current Texas mitigation special issue fails to allow a jury to give effect to mitigating

evidence. *Scheanette*, 482 F.3d at 826; *McCoskey v. Thaler*, 478 Fed. Appx. 143, 149-51 (5th Cir. 2012) (unpublished), *cert. denied*, 2013 WL 57247 (2013).

## IX. There Was No Violation of the Ex Post Facto Clause.

White claims that the mitigation special issue resulted in an ex post facto violation. First, the claim is improperly briefed because White merely refers to the lower court's rejection of his claim without briefing it in any detail. He fails to explain the nature of his complaint, why the special issue violates the Ex Post Facto Clause, and why the lower court's analysis was wrong. He mentions the Ex Post Facto Clause in relation to *Teague v. Lane*, brief at 17, 21, but that was not his argument in the lower court. Thus, he has waived this claim.

Regardless, his allegation has no merit, and the lower court properly rejected this claim. DE 81 at 12-13. In his habeas petition, White contended that the mitigation instruction submitted to the jury violated the Ex Post Facto Clause because, at the time the offense occurred, state law did not require a mitigation instruction. Citing *Weaver v. Graham*,[13]

---

[13]    450 U.S. 24 (1981).

White contended that the mitigation special issue submitted at his trial placed him in a more "onerous" position because he was forced to present evidence in mitigation, such as head injuries and drug use, that the jury might perceive to be aggravating. Therefore, he claimed that the instruction was a vehicle for imposing additional punishment given that there was a lack of mitigating circumstances and that the law in place at the time of the offense "did not require the presence of mitigating circumstances for the imposition of a life sentence." Consequently, he risked death if he did not put forth mitigating evidence, even though the mitigating evidence could be used against him. DE 27 at 39-40.

White completely misconstrues the mitigation special issue. White suggests that he had no option but to offer damaging mitigating evidence because, otherwise, the jury would have imposed the death penalty. In other words, his argument assumes that an affirmative finding to the first two special issues was automatic and the only way he could have received a life sentence was to present mitigating evidence. However, an affirmative finding to the mitigation special issue is not required for the imposition of a life sentence because, if the jury does not answer

affirmatively the deliberateness and future dangerousness special issues, a life sentence is automatically imposed and the jury need not even consider the mitigation issue.  Further, the State is required to prove the first two special issues beyond a reasonable doubt.  If the defendant so chooses, he can offer no evidence during punishment and simply require the State to prove its case.  The same, of course, applies to the guilt/innocence stage of trial.  Yet, under White's argument, a defendant would be required to present evidence of his innocence in order to be found not guilty.  Such reasoning is contorted.

Moreover, the mitigation special issue in no way requires a defendant to offer mitigating evidence; it simply provides the defendant a legally sufficient means to show that a life sentence is warranted *in the event* the jury determines the defendant acted with deliberateness and constitutes a future danger.  In other words, the statute is designed to work to the defendant's benefit, and it is up to the defendant and his counsel to decide how to take advantage of it.  Whether or not a defendant receives a life sentence is up to the jury, and this actually appears to be White's complaint.  Essentially, he is claiming that the mitigation special

issue worked to his disadvantage because there simply were not any mitigating circumstances in his case. This is not a consequence of the special issues themselves, but rather a function of the case evidence. However, as this Court has held, "the Eighth and Fourteenth Amendments do not require that a defendant's mitigating evidence be given effect in the manner and extent the defendant wishes. All that is required is that the jury be afforded one adequate vehicle to consider the mitigating evidence." *Narvaiz v. Johnson*, 134 F.3d 688, 696 (5th Cir. 1998). Because the jury in White's case was afforded this vehicle, he has no basis for a complaint.

## X.  Article 37.071 of the Texas Code of Criminal Procedure is Not Unconstitutional.

White alleges that the Texas death penalty statute, article 37.071 section 2(e) of the Code of Criminal Procedure, violates the Eighth and Fourteenth Amendments. Again, it is arguable that White has not properly briefed these issues because he merely incorporates by reference the lower court's opinion, and he does not lay out his arguments with any specificity. Brief at 25-27.

Regardless, his claims lack merit. In his district court petition, White argued that the statute fails to meet the requirements of *Furman v. Georgia*[14] because it (1) inappropriately shifts the burden of proof to the defendant; (2) gives the jurors unstructured discretion because it fails to give jurors any guidance for determining what would be mitigating as opposed to aggravating; (3) fails to allow meaningful appellate review of the mitigating evidence; (4) does not properly define "mitigating evidence;" and (5) fails to inform the jury that it must automatically sentence the defendant to life imprisonment in the event of a deadlock. *See* DE 27 at 41-43. The lower court properly rejected these claims. DE 81 at 13-16.

First, this Court has repeatedly denied claims that the mitigation special issue shifts the burden of proof. *Rowell*, 398 F.3d at 378; *Hughes v. Johnson*, 191 F.3d 607, 625-26 (5th Cir. 1999). Moreover, this claim is barred under the non-retroactivity doctrine of *Teague v. Lane*.

Second, White's claim that the special issues fail to provide the jurors with guided discretion regarding aggravating and mitigating factors, in violation of *Furman,* lacks merit. The Constitution is satisfied

---

[14]     408 U.S. 238 (1972).

as long as a capital-sentencing scheme "rationally narrows the class of death-eligible defendants and permits a jury to consider any mitigating evidence relevant to its sentencing determination." *Kansas v. Marsh*, 548 U.S. 163, 175 (2006). This Court has held that the Texas death-penalty scheme meets this requirement. *Sonnier v. Quarterman*, 476 F.3d 349, 366-67 (5th Cir. 2007). The Supreme Court has long held the same. *Jurek v. Texas*, 428 U.S. 262, 271 (1976).

Third, the Supreme Court has held that the Eighth Amendment requirement of meaningful appellate review does not require an appellate court to independently re-weigh aggravating and mitigating evidence. *Pulley v. Harris,* 465 U.S. 37, 45-46 (1984); *McCleskey v. Kemp*, 481 U.S. 279, 308 (1987); *Hughes*, 191 F.3d at 621-23. In fact, the Court has never held that the United States Constitution entitles a capital defendant to have an appellate court redetermine the jury's verdict on punishment. *See, e.g., Sawyer*, 505 U.S. at 345-46 (noting that any assumption about how a rational jury would resolve reasonable doubts about the existence and weight of mitigating factors or the ultimate issue of punishment would have to be based on pure speculation). Thus, the claim is *Teague-* barred.

Fourth, this Court upheld the validity of Article 37.071 § (2)(f)(4) in *Beazley v. Johnson*. In that case, this Court found that Article 37.071 § (2)(f)(4) "does *not* unconstitutionally 'preclude [] [the jury] from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Beazley,* 242 F.3d at 260 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) (emphasis in original). The court determined that "[t]he definition of mitigating evidence does *not* limit the evidence considered under the third special issue[,]" because "'virtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues.'" *Id.* (emphasis in original) (quoting *Graham v. Collins*, 506 U.S. 461, 476 (1993)).

Last, the Supreme Court rejected the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation. *Jones v. United States*, 527 U.S. 373, 375-76 (1999). This Court has found this allegation to be *Teague*-barred. *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *Webb v. Collins,*

2 F.3d 93 (5th Cir. 1993).

## XI.  White Was Not Denied Equal Protection.

White contends that he was denied equal protection on two grounds: (1) because of his race (he is African-American) and (2) because of disparate treatment of those facing the death penalty as opposed to those who are not.  Brief at 28-30.  Again, by merely referring to the district court's decision without sufficiently briefing his contentions, his claim is arguably waived.

Nonetheless, with respect to the former allegation, White appears to contend *Bush v. Gore*[15] overruled or modified the Supreme Court's holding in *McCleskey v. Kemp*, which requires a defendant to demonstrate purposeful discrimination in his case in order to prove an equal protection violation.  481 U.S. at 292.  This Court has held that *Bush v. Gore* does not affect criminal proceedings.  *Coleman v. Quarterman*, 456 F.3d 537, 542-43 (5th Cir. 2006) ("In two unpublished decisions, this court previously has discussed *Bush v. Gore*'s utter lack of implication in the criminal procedure context.  We adopt the reasoning of those persuasive

---

[15]     531 U.S. 98 (2000).

opinions and, likewise, conclude that the question is beyond debate.").

White still must prove that the decisionmakers in *his* case acted with a discriminatory *purpose*, and that the discriminatory purpose had a discriminatory effect on *him. See McClesky*, 481 U.S. at 292. He has never made this showing.

With regard to the latter allegation, White contended, at least in district court, that Texas Code of Criminal Procedure, Article 11.071, violates his rights to equal protection of the law and due process because it restricts the time within which an inmate must file his application for state habeas relief, despite the fact that Article 11.07 (the non-capital habeas corpus statute) imposes no such time limits. First, White lacks standing to raise this issue because he timely filed a state habeas application; thus he was not harmed. *Allen v. Wright*, 468 U.S. 737, 751 (1984) ("The requirement of standing . . . has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Second, alleged infirmities in state habeas proceedings do not constitute grounds for federal habeas relief. *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992). Third,

this Court has also rejected this claim. *Coleman*, 456 F.3d at 543.

## XII. White's Claims Challenging the Clemency Process Are Not Ripe, and They Lack Merit.

Last, White alleges that Texas's clemency procedures violate equal protection because of his race and violate international law. Brief at 31-34. The lower court's denial of these claims is not debatable. DE 81 at 17-18. First, White does not have an execution date, and he has not filed a petition for executive clemency. As a result, the Texas Board of Pardons and Paroles has not been given the opportunity to issue a formal decision on clemency in White's case. Thus, as the lower court held, White's claims are not ripe. *Texas v. United States,* 523 U.S. 296, 300 (1998); *New Orleans Public Service, Inc. v. Council of New Orleans,* 833 F.2d 583, 586-87 (5th Cir. 1987).

Second, this Court has determined that Texas's clemency procedures provide the minimal procedural safeguards required by federal law. *Faulder v. Texas Board of Pardons and Paroles*, 178 F.3d 343, 344-45 (5th Cir. 1999); *Moody v. Rodriguez*, 164 F.3d 893, 894 (5th Cir. 1999). And the procedures are not discriminatory, nor do they violate international law. *Coleman*, 456 F.3d at 542 (upholding district court's denial of

allegation that Texas's clemency procedures are infused with racial considerations); *Roach v. Quarterman*, 220 Fed. Appx. 270, 275 (5th Cir. 2007) (rejecting claim that the clemency procedures violate international law) (unpublished); *Lagrone v. Cockrell*, 2003 WL 22327519, *13 (5th Cir. 2003) (same) (unpublished).

Third, with regard to international law, White claimed in the lower court that the clemency procedures ran afoul of the International Covenant on Civil and Political Rights (ICCPR). But the ICCPR is not self-executing, and Congress has not adopted legislation to implement the agreement; thus it is not binding on federal courts. *See Beazley,* 242 F.3d at 267; *see also Medellin v. Texas*, 552 U.S. 491, 513-14 (2008).

## CONCLUSION

For the above reasons, the Director respectfully requests this Court deny COA.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation
Division

/s/ W. Erich Dryden
*Attorney-in-Charge          *W. ERICH DRYDEN
Assistant Attorney General
State Bar No. 24008786

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
(512) 936-1280 (Fax)

ATTORNEYS FOR
RESPONDENT-APPELLEE

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation and

contains about 13,672 words. *See* Fed. R. App. Proc. 32(a)(7)(B).

/s/ W. Erich Dryden
W. ERICH DRYDEN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE
## WITH ECF FILING STANDARDS

I do hereby certify that: (1) all required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.1; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus-scanning program and is free of viruses.

/s/ W. Erich Dryden
W. ERICH DRYDEN
Assistant Attorney General

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the above and foregoing Opposition to Application for Certificate of Appealability has been served electronically to Patrick McCann, counsel for Petitioner-Appellant, on this the 7th day of February, 2013.

/s/ W. Erich Dryden
W. ERICH DRYDEN
Assistant Attorney General